UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at KNOXVILLE

APPALACHIAN VOICES, *et al*.,           )
                                                            )
           *Plaintiffs,*                               )
                                                            )           Case No. 3:24-cv-411
v.                                                        )
                                                            )           Judge Curtis L. Collier
TENNESSEE VALLEY AUTHORITY,    )           Magistrate Judge Debra C. Poplin
                                                            )
           *Defendant.*                             )

**M E M O R A N D U M**

Before the Court is a motion by Plaintiffs Appalachian Voices, the Center for Biological Diversity, and the Sierra Club to require Defendant Tennessee Valley Authority ("TVA") to complete and supplement the administrative record. (Doc. 28.) TVA responded in opposition (Doc. 30), and Plaintiffs replied (Doc. 32).

I.      **BACKGROUND**

In 2021, TVA announced that it would retire the nine coal-fired units at the Kingston Fossil Plant, a coal-fired power plant located in Roane County, Tennessee. (Doc. 30 at 8.) After reviewing proposed environmental impacts, TVA published an Environmental Impact Statement ("EIS") in February 2024 and then a Record of Decision in April 2024. (*Id.*; Doc. 29 at 4.) TVA's President and CEO decided to adopt the preferred alternative, which was building the Kingston Gas Plant. (Doc. 30 at 8.)

Plaintiffs sued TVA alleging violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.* and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706 *et seq.* (Doc. 1 at 1.) They allege that TVA violated NEPA because it was pre-committed to building the Kingston Gas Plant before making a final decision and that TVA's

decision to build the Kingston Gas Plant was arbitrary and capricious. (*Id.* ¶¶ 238-84, Doc. 29 at 2–4.)

APA review is based on "the full administrative record that was before the [decisionmaker] at the time [he/she] made the decision." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). TVA filed its administrative record with the Court on May 5, 2025. (Doc. 26.) Now, Plaintiffs allege that there are several pieces of evidence that either were considered and not put into the administrative record, or that should be part of the Court's review regardless of whether they were considered. (Doc. 29 at 12–18.)

Plaintiffs allege that there is clear evidence that TVA considered several pieces of evidence that they omitted from the administrative record. (*Id.*) The first is a contract with General Electric ("GE") from December 22, 2022, which "included an option for TVA to purchase equipment for a potential [gas] plant at Kingston." (Doc. 30 at 11; AR at 055218–055307.) The second is an August 2021 Precedent Agreement with East Tennessee Natural Gas ("ETNG"), where TVA agreed to purchase the entirety of the pipeline's shipping capacity for an initial twenty-year term. The agreement was contingent on the outcome of the requisite environmental reviews and on necessary regulatory approvals. (AR at 055179–05580.) Redacted versions of both contracts are in the record because Conservation Groups attached them to their comments.

Plaintiffs also argue that the TVA should have included its Financial and System Analysis in the administrative record because TVA used this analysis "to find the Kingston Gas Plant was the lowest-cost option, a key factor in TVA's final decision to build the plant." (Doc. 29 at 20.) According to TVA, Plaintiffs' request is not one for discrete documents, but rather a request for underlying modeling tools and source data. (Doc. 31.) The results of the modeling are included in the administrative record in Appendix B to the EIS (AR 002784–2803), but the actual modeling

2

and data underlying the analysis are not included in the record.

Alternatively, Plaintiffs argue that even if TVA did not consider these pieces of evidence, the Court should order supplementation of the record with these materials as well as three other documents, the Lyash Email, TVA Securities and Exchange Commission ("SEC") Filing, and Enbridge SEC Filing, due to alleged bad faith on the part of TVA. (Doc. 29 at 22.) The Lyash Email is an email produced by TVA from its Chief Executive Officer ("CEO"), Jeff Lyash, on December 22, 2022, to the TVA Board describing the GE Contract. (Doc. 29-8 at 2.) The TVA SEC Filing is an April 30, 2024, filing with the SEC that Plaintiffs allege "detailed the significant expenses the agency incurred for the Kingston project before the April 2024 Record of Decision." (Doc. 29 at 13.) The Enbridge SEC Filing is a filing by the parent company of ETNG, Enbridge, Inc., with the SEC, where Enbridge "reported that it had spent $94 million on the project by March 31, 2024, before TVA's April 2024 Record of Decision." (Doc. 29 at 18 (citing Doc. 29-10 at 4).)

## II.    **STANDARD OF REVIEW**

The parties disagree on the standard of review for the motion. They disagree about whether "completion" and "supplementation" of the administrative record are different questions subject to different standards, and they disagree about what those standards should be. Plaintiffs argue that TVA should complete, or, in the alternative, supplement the administrative record. Here, the term "completion" is used to challenge TVA's designation of the administrative record. Plaintiffs seek to add documents that they allege were before the agency. The term "supplementation" is used to request extra-record evidence, or to add documents that plaintiffs admit were not before the agency but should be considered nonetheless.

TVA argues that "[t]he Sixth Circuit has not distinguished between 'completing the record' and 'supplementing the record' as Plaintiffs invite this Court to do." (Doc. 30 at 16.) Defendant

3

asserts there is only one standard for the claim which requires both "exceptional circumstances" and "a strong showing of bad faith" to supplement the record. (*Id*.) To be sure, district courts in this Circuit have gone both ways on this issue.[1] But the United States Supreme Court and the Court of Appeals for the Sixth Circuit have recognized a difference between seeking to add to the record materials the agency considered and seeking to engage in extra-record discovery to add materials the agency did not consider. For the reasons that follow, this Court recognizes the distinction as well.

Completion and supplementation have been used interchangeably and sometimes imprecisely.[2] The operative distinction is functional, not linguistic. To start, the Supreme Court

---

[1] Some districts in this Circuit have distinguished between completion and supplementation. *See, e.g., Hickey v. Chadick*, No. 2:08-cv-824, 2009 U.S. Dist. LEXIS 92880 at *4–8 (S.D. Ohio Sept. 18, 2009) (distinguishing between adding to the record with documents that were before the agency and supplementing the record with documents through discovery, and applying different standards of review to each challenge); *Gun Owners of Am., Inc. v. U.S. Dep't of Justice*, 695 F. Supp. 3d 920, 928 n.4 (E.D. Mich. Sept. 27, 2023) ("Notably, *supplementation* of the administrative record is distinct from *completion* of the administrative record in APA cases. Completing the record means including evidence that the agency considered but did not submit. Supplementing the record means introducing evidence that the agency did not consider but is necessary for the court to conduct a substantial inquiry."); *Weiss v. Kempthorne*, No. 1:08-cv-1031, 2009 U.S. Dist. LEXIS 59711 (W.D. Mich. July 13, 2009) (noting that "[p]laintiffs appear to conflate materials that they believe should be part of the administrative record (i.e. because they are materials that were 'before the agency'), with materials that [p]laintiffs believe the Court should consider in addition to the administrative record" and applying different standards to each scenario).

Others maintain there is no distinction. *See, e.g., Ky. Heartwood, Inc. v. U.S. Forest Serv.*, No. 6:22-cv-169, 2023 WL 11963553 (E.D. Ky. Aug. 3, 2023) (stating that "courts in the Sixth Circuit do not distinguish between motions for completion and supplementation of the administrative record."); *City of Crossgate v. U.S. Dep't of Veterans Affairs*, No. 3:18-cv-167, 2020 WL 1812014, at *1 (W.D. Ky. Feb. 12, 2020) (*citing Ohio Coal Ass'n v. Perez*, No. 2:14-cv-2646, 2017 WL 900165, at *3 (S.D. Ohio Feb. 27, 2017)) ("While some courts attempt to distinguish between 'completion' and 'supplementation', the Sixth Circuit does not distinguish between the two.").

[2] Some out-of-circuit cases use different terms to describe each challenge, which has led to confusion. *See, e.g.*, *Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006) ("There appears to be some confusion regarding the difference

4

has found a distinction between completion and supplementation, though it has not set a clear standard of review for completion. In *Department of Commerce v. New York*, 588 U.S. 752, 782 (2019), the Court noted that a supplemental memorandum "prompted respondents to move for both completion of the administrative record and extra-record discovery." In that case, the Supreme Court treated the district court's conclusion that the record was incomplete differently than the district court's order authorizing extra-record discovery, noting that the Department of Commerce objected to the latter and not the former. *Id.* The Court concluded that "[t]he District Court should not have ordered extra-record discovery when it did. At that time, the most that was warranted was the order to complete the administrative record." *Id*. The Court sees this decision as establishing a difference between completion and extra-record discovery, requiring a different standard of review for each.

Such a distinction also follows from the Supreme Court's decision in *Overton Park*, which requires courts to review actions based on the administrative record provided and allows "inquiry into the mental processes of administrative decisionmakers" only upon a "strong showing of bad faith or improper behavior." *Overton Park*, 401 U.S. at 420. *Overton Park* sought to prevent post-

---

between supplementing the record, i.e. adding to the volume of the administrative record with documents the agency considered, and allowing the review of extra-record evidence, i.e. viewing evidence outside of or in addition to the administrative record that was not necessarily considered by the agency."); *cf. Oceana, Inc. v. Pritzker*, 217 F. Supp. 310, 316 (D.D.C. 2016) ("There are two grounds on which a party may seek 'supplementation' of the administrative record. First, a party may request the disclosure of evidence that should have been properly a part of the administrative record but was excluded by the agency… [f]or clarity, the Court will refer to compelling discovery on the first ground as completion of the administrative record. Second, a party may request disclosure of extrajudicial evidence that was not initially before the agency but the party believes should nonetheless be included in the administrative record… [t]he Court will refer to compelling discovery on the second ground as supplementation of the administrative record.") (internal quotations and citations omitted). And this confusion has led to some courts in this Circuit using the two words interchangeably. But this labeling choice does not impact the difference between the two concepts.

hoc rationalizations of agency decisions by focusing only on "the full administrative record that was before the [decisionmaker] at the time he made his decision." *Id.* at 419–20. Requiring bad faith mitigates against post-hoc rationalizations and confines review to the materials that were actually before the agency. *See id.* at 420. But there is no reason that same requirement would apply to motions to merely complete the administrative record, because those seek to add materials that were before the agency at the time of the decision. There is no concern about post-hoc rationalizations or courts seeking to read the minds of the decisionmakers if the materials sought were, in fact, actually before the agency but simply omitted from the record. Thus, *Overton Park* implies a distinction between situations where courts look to supplement the administrative record with materials outside the agency's review and situations where courts complete the administrative record by providing for materials that were actually before the agency.

The line of cases in the Sixth Circuit also shows this functional distinction and suggests a different standard for completion and supplementation. The Sixth Circuit has used a standard of extraordinary circumstances, bad faith, or needing background information when parties seek to add material not considered by the agency. In *Sierra Club v. Slater*, 120 F.3d 623, 638 (6th Cir. 1997), the Sixth Circuit outlined the standard for supplementation in response to the plaintiff's argument that "a reviewing court may consider evidence outside the [administrative] record." Its analysis heavily relied upon the Court of Appeals for the D.C. Circuit's decision in *James Madison Limited by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996), which addressed whether the reviewing court could look outside the record to materials not considered by the agency. The Court treated the question of supplementation as "akin to a district court's denial of discovery," further suggesting that this standard applies when adding to the record new information not initially considered by the agency. *Slater*, 120 F.3d at 639.

The Sixth Circuit also considered a supplementation request in *Charter Township of Van Buren v. Adamkus*, No. 98-14631999, U.S. App. LEXIS 21037, at *13–15 (6th Cir. 1999) (table). There, the parties requested addition of a supplemental affidavit that would explain to the Court the technical terms involved in the permit application process and show that the Environmental Protection Agency disregarded evidence adverse to its position. *Id.* at 13–14. The parties also requested to depose EPA officials. Both requests were analyzed under the "exceptional circumstances" test, where the Court examined whether an agency, either deliberately or negligently, excluded documents that may have been adverse to its position or whether the Court needed additional background information to determine whether the agency considered all relevant factors. *Id.* In *Harkness v. Secretary of the Navy*, 858 F.3d 437, 451–53 (6th Cir. 2017), the Sixth Circuit applied the supplementation standard to a case reviewing a district court's refusal to permit discovery beyond the administrative record. *See also Lat. Ams. for Soc. & Econ. Dev. v. Admin. of Fed. Highway Admin.*, 756 F.3d 447, 465 (6th Cir. 2014) (same). Both cases used a standard that required a showing of bad faith and either deliberate or negligent exclusion, or a need for background information, and both cases involved extra-record discovery.

Those cases differ from the Sixth Circuit's understanding of cases where parties seek to complete the administrative record with materials that were already before the decisionmaker. *Sierra Club v. Tennessee Department of the Environment and Conservation*, No. 23-3682, 2024 U.S. App. LEXIS 6614, at *6 (6th Cir. Mar. 19, 2024) demonstrates this approach. There, the Sixth Circuit, in summarizing *Slater*, read that case as "discussing supplementation as opposed to completion of an administrative record." *Id.* And in that case, the Sixth Circuit entertained a motion to complete the record without analyzing bad faith or deliberate or negligent exclusion, ultimately analyzing whether certain materials were considered by the decision-maker and

7

referring the question of privilege to the merits panel. *Id.* The same was true in *Sherwood v. Tennessee Valley Authority,* 590 F. App'x 451, 466 (6th Cir. 2014), a NEPA case. There, the Sixth Circuit reviewed a district court's finding that TVA properly designated the administrative record and found that "the plaintiffs. . . presented clear evidence that TVA [did] not designate[] the proper administrative record." *Id.* at 462–63. The Sixth Circuit remanded the case to the district court and required TVA "to submit the proper administrative record to the district court." *Id.* In its review, the Sixth Circuit used the clear evidence standard rather than a standard requiring bad faith and either deliberate or negligent exclusion or a need for background information. *Id.* at 459-60.

Accordingly, the Sixth Circuit has treated completion and supplementation as distinct scenarios with distinct purposes. This Court follows the Supreme Court's understanding that there are two standards, and the Sixth Circuit's guidance on what those standards are.

Completion applies when a plaintiff argues that there was evidence before the decisionmaker that is not in the record. When a plaintiff seeks to complete the administrative record, there is a strong presumption of regularity given to the agency's submitted record, but it can be overcome by clear evidence to the contrary. *Ohio Coal Ass'n,* 2017 U.S. Dist. LEXIS 216950, at *6. This is because a court's review of an agency action should be based on the administrative record already in existence, which includes materials that were before the agency at the time the decision was made. *Slater*, 120 F.3d at 638.

 For situations where parties are asking to introduce extra-record evidence that was *not* before the decisionmaker, the supplementation standard applies. If parties seek to add documents or materials that were not considered by the decisionmaker, a party must show "exceptional circumstances," under which the reviewing court may exercise its discretion to expand or supplement the administrative record." *Adamkus*, 1999 U.S. App. LEXIS 21037, at *14. The

8

Court may allow a party to supplement the administrative record when an agency deliberately or negligently excludes certain documents, or when the court needs certain background information to aid the court's understanding or determine if the agency examined all relevant factors. *U.S. v. Akzo Coatings of Am., Inc.*, 959 F.2d 1409, 1428 (6th Cir. 1991).

There is one more contested issue regarding the standard of review. The parties disagree whether the supplementation standard requires a strong showing of bad faith. TVA argues that bad faith is required; Plaintiffs argues bad faith is not required. The Sixth Circuit has come out both ways on this. For example, in *Adamkus*, the Sixth Circuit suggested that bad faith was only one avenue for allowing supplementation, not a requirement every time. 1999 U.S. App. LEXIS 21037, at *14 (noting that "courts have also permitted supplementation of the record if the plaintiff has made a strong showing of bad faith on the part of the agency"). But in *Latin Americans for Social and Economic Development v. Administrator of the FHA*, the Sixth Circuit stated that in supplementation cases, "plaintiff *must* make a strong showing of bad faith." 756 F.3d 447, 465 (6th Cir. 2014) (emphasis added). The Court takes the position that bad faith is a conjunctive requirement. While the Court recognizes that *Adamkus* outlines the requirements as disjunctive, that was an unpublished opinion and not binding, meaning that the test outlined in *Latin Americans* controls. [3] *See Honigman v. Comerica Bank (In re Van Dresser Corp.)*, 128 F.3d 945, 948 (6th Cir. 1997) (noting that an unpublished opinion was "thus not binding on this court.") Furthermore, such a disposition is consistent with Supreme Court precedent, which has routinely required bad faith in order to authorize extra-record discovery. *Dep't of Comm.*, 588 U.S. at 792 (2019)

---

[3] The Court notes that in *Slater*, 120 F.3d at 638, the Sixth Circuit said "[c]ourts have suggested that in order to justify supplementation, a plaintiff must make a strong showing of bad faith." The Sixth Circuit did not decide the standard in that case, and the Court takes the decision in *Latin Americans* to be conclusive on the issue.

9

(requiring a "strong showing of bad faith or improper behavior" to proceed beyond the administrative record) (citing *Overton Park*, 401 U.S. at 420).

## III.  DISCUSSION

The Court will first address Plaintiffs' completion claim, and then it will address Plaintiffs' supplementation claim. The Court will address each piece of contested evidence in turn.

### A.  Completion of the Record

Plaintiffs ask the Court to require TVA to complete the record with five items: (1) TVA's complete and unredacted Precedent Agreement with East Tennessee Natural Gas related to pipeline infrastructure to serve the Kingston Gas Plant; (2) records of expenses incurred in fulfilment of TVA's obligations under the Precedent Agreement prior to publication of the Record of Decision on April 8, 2024; (3) TVA's complete and unredacted December 22, 2022, contract with General Electric; (4) records of expenses TVA incurred prior to April 8, 2024; and (5) TVA's financial and system analysis.  (Doc. 29 at 12–18.)

"The record should consist of all materials compiled by [the agency] that were either directly or indirectly considered." *In re U.S. Dep't of Def. & U.S. Env't Prot. Agency Final Rule: Clean Water Rule: Definition of "Waters of the United States," 8 Ed. Reg. 37,054 (June 29, 105), Murray Energy Corp., et al., v. U.S. Dep't of Def., Dep't of the Army Corps of Eng'rs; & EPA*, No. 15-3751, 2016 WL 5845712, at *1 (6th Cir. Oct. 4, 2016).  The whole record includes "all documents and materials that the agency directly or indirectly considered…. [and nothing] more nor less." *Pac. Shores Subdivision,* 448 F. Supp. 2d at 4.  "Absent clear evidence to the contrary, the reviewing court assumes the agency has properly designated the administrative record." *Sherwood*, 590 F. App'x at 459 (6th Cir. 2014).  The agency's certification of the record is "entitled to a presumption of regularity." *Clean Water Rule*, 2016 WL 5845712, at *1 (*citing Overton Park*,

401 U.S. at 415 and *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993)). "Agency consideration is a touchstone of a motion to complete the record–the addition of relevant documents that were considered, directly or indirectly, by the agency decisionmaker at the time of the decision are part of the record." *Fort Sill Apache Tribe v. Nat'l Indian Gaming Com.*, 345 F. Supp. 3d 1, 9 (D.D.C. 2018). It is not enough to show that the decisionmaker knew of a particular record; rather, the plaintiff must show that the decisionmaker actually considered said material in making a decision. *See Pac. Shores Subdivision*, 448 F. Supp. 2d at 4. The movant "must identify reasonable, non-speculative grounds for its belief that the documents were… not included in the record." *Protect Our Aquifer v. Tenn. Valley Authority*, No. 2:20-cv-02615, 2022 WL 341014, at *2 (W.D. Tenn. Jan. 24, 2022).

Other circuits distinguish between direct consideration and indirect consideration, which is particularly relevant when a party argues that there were underlying sources considered but not included. *See, e.g., Wildearth Guardians v. U.S. Forest Serv.*, 713 F. Supp. 2d 1243 (D. Colo. 2010); *WildEarth Guardians v. Salazar*, No. CV-09-00574, 2009 U.S. Dist. LEXIS 110588, at *10–11 (D. Ariz. Nov. 24, 2009); *Amfc Resorts, LLC v. United States DOI*, 143 F. Supp. 2d 7, 12–13 (D.D.C. 2001). The Sixth Circuit also suggests that underlying source material may be included even if it was not directly considered. *See Partners in Forestry Co-Op., Northwood All., Inc. v. U.S. Forest Serv.*, 638 F. App'x 456, 469 (6th Cir. 2015) ("There is no requirement that the administrative record include all underlying sources unless the report relies so heavily on the underlying sources that the agency might fairly be said to have considered the sources merely by considering the documents in which they were cited."). Therefore, if a plaintiff is alleging there is an underlying source that needs to be included, the plaintiff must show that the documents were relied on so heavily that the decision-maker constructively considered them. *See id.*; *see also Safari*

11

*Club Int'l v. Jewell*, No. CV-16-94, 2016 WL 7785452, at *2 (D. Ariz. July 7, 2016) (internal citations and quotations omitted).

### 1. Contracts

There are two contracts that Plaintiffs allege TVA considered but did not cite to in the record. The first is TVA's contract with GE and the second is TVA's Precedent Agreement with ETNG. The question at hand is whether reference to promised goods in a contract means that the decisionmaker considered the actual contract and its terms in its entirety. To be certain, the EIS does reference the goods that ETNG and GE would respectively deliver if the contract was accepted. The question this Court must address is whether the decisionmaker, in considering the contract's purported product and price, necessarily considered the terms of the contract itself such that the contract was meaningfully "before" the decisionmaker. *See Slater*, 120 F.3d at 639. The Court will address the GE contract first and then the ETNG contract.

TVA signed a contract and executed a purchase order in December 2022 with GE for power island equipment intended for the Kingston plant. (Doc. 1 ¶ 279.) That power island equipment included advanced-class gas turbine generators, steam turbine generators, and heat recovery steam generators and associated equipment. (AR 055217–325.) There are several ways in which Plaintiffs allege the GE contract was considered.

First, Plaintiffs allege that in a response to comments about the GE contract, TVA outlined the scope of their commitments under the contract. (Doc. 29 at 14.) They state in order to analyze the scope of TVA's commitments and determine that it was not pre-committed, this determination necessarily required a full review of the contract. (*Id.*) It is true that to outline the scope of TVA's commitments, they needed to know the scope of the full contract. But this is evidence that TVA considered the contract in *responding to the comment*, not in c*oming to their decision about*

12

*whether to build the plant* or in *conducting their environmental review*.

The comment made by plaintiffs inquired into the scope of TVA's precommitments. TVA was required to respond to this comment. 40 C.F.R. § 1503.4. Stating that TVA was not pre-committed under a contract does not mean that the terms of the contract suddenly became a factor in making the actual decision about whether to build the plant or in conducting its environmental analysis. Under Plaintiff's reasoning, any document, no matter how irrelevant, could be forced into the administrative record by simply inquiring about it, even in the vaguest of terms; even a response that states a document is not relevant would necessarily require an agency to be familiar with the document. It is not apparent to the Court that considering the contract in response to a comment means that TVA considered the contract in its decision-making. *See Creation Ent., Inc. v. SBA*, 2025, No. 22-0684, U.S. Dist. LEXIS 121026, at *7 (D.D.C. Feb. 6, 2025) ("[T]he question is not whether plaintiff made an effort at some point to put the material before the agency, but whether the material was in fact considered by the agency….").

Second, Plaintiffs allege there is evidence that the CEO, Mr. Lyash, directly relied on the contract terms and price to come to a final decision on the TVA plant. (Doc. 29 at 15.) The Court agrees.

Plaintiffs cite an email between Mr. Lyash and the Board about the GE contract as proof that Mr. Lyash directly considered the contract. (Doc. 29-8.) That email informs the Board of the existence of the GE contract. (*Id.* at 2.) The email says that "long-lead procurement actions are needed to maintain TVA's current preferred retirement and replacement schedule for the first unit at Cumberland, and to lock in pricing on a potential CC plant at Kingston." (*Id.*) Of course, "[t]he fact that a document is merely mentioned does not lead to the… conclusion" that the decisionmakers actually considered the document." *WildEarth Guardians v. Salazar*, 670 F.

13

Supp.2d 1, 6 (D.D.C. 2009). But this is more than a mention of the contract; it is a clear statement that Mr. Lyash considered the contract price, in particular, and the terms of the contract in coming to his final decision. Mr. Lyash references these "long-lead procurement actions," of which the contract is one, as necessary for the retirement of the plant and future action. (Doc. 29-8 at 2.)

TVA states that the contract price is a "business decision" that is not relevant to whether TVA took the requisite hard look at the environmental impacts of the project. (Doc. 30 at 21.) But Plaintiffs are challenging the decision under both section 706 of the APA and NEPA, and argue that TVA's least-cost analysis and reliance on such analysis was arbitrary and capricious. And "review of the whole record under section 706 [of the APA] is to be based on the full administrative record that was before the agency decisionmakers at the time they made their decision." *Pac. Shores Subdivision,* 448 F. Supp. 2d at 4. Therefore, the cost-related information considered in making the decision to build the plant is relevant to the APA challenge.

There is also evidence that the decisionmaker indirectly considered the contract through his substantial reliance on the contract's promised goods in the environmental impact statement. A complete record should include "all materials that might have influenced the agency's decision," and data that was "sufficiently integral to the final analysis that was considered by the agency" upon which the agency relied heavily should be included in the record. *Health v. Burwell*, 126 F. Supp. 3d 28, 59 (D.D.C. 2015). While the actual contract itself is not mentioned in the EIS, products to be purchased pursuant to the contract are heavily presented in Alternative A. The EIS references items that would be purchased under the GE contract in several places, which suggests that the terms of the GE contract were meaningfully considered by the agency decisionmaker, particularly in evaluating its cost. In particular, TVA's use of specifications from items purchased pursuant to the GE contract in its EIS shows that material terms in the contract were considered in

14

analyzing the environmental impacts of the contract. For example, in the section assessing the natural gas resource costs, TVA lists the costs of the GE model 1x1 and 2x1 7HA.03 combined cycle turbines. (AR 002789.) And in its modeled sound power levels analysis, the EIS analyzes the sound power of the LM6000 simple-cycle combustion turbine, which is a GE Model turbine. (AR 003251.)

It is hard to believe that the contract price and its promised goods were directly considered by Mr. Lyash and by drafters of the EIS in coming to a final decision, but the actual contract itself was not. The agency had the contract before it when it put forth the specifications that would support Alternative A, because in order to pick the GE turbine as the presumptive turbine, the agency had to consider whether the terms of the contract were amenable. It is hard to fathom that Mr. Lyash blindly picked GE's quotes and product without considering the contract under which those products would be delivered. The goods contracted for are necessarily intertwined with the underlying contract. Therefore, Plaintiffs have presented clear evidence that the decisionmaker considered the contract. *See Ohio Coal Ass'n*, 2017 U.S. Dist. LEXIS 216950, at *6.

The second contract is the ETNG contract. Plaintiffs allege that TVA both directly and indirectly considered the ETNG contract. (Doc. 29 at 16.) The Court does not find any evidence that Mr. Lyash, or any other decisionmaker, directly considered this document. Plaintiffs cite to the Waldrep declaration, where Mr. Waldrep, the Vice President of Major Projects at TVA, references both the GE Contract and the ETNG agreement. (Doc. 29 at 8–9.) But as Defendant correctly points out, Mr. Waldrep is not the agency decisionmaker for the project and the declaration post-dates the Record of Decision and refers to a different project. (Doc. 30 at 21.)

Plaintiffs also allege that TVA indirectly considered the contract because, in response to Conservation Groups' comments on the draft EIS, they fully evaluated the scope of their

commitments under the contract. (Doc. 29 at 17.) This argument fails for the same reason as the argument about the GE contract fails.

But there is evidence of indirect consideration. Plaintiffs argue that the final EIS explains that "[u]nder Alternative A, ETNG would construct and operate a 122-mile natural gas pipeline pursuant to an agreement with TVA," and a footnote explains what a precedent agreement is. (Doc. 29 at 16; AR 001876.) The actual Precedent Agreement is only mentioned once in the EIS, in a footnote explaining the definition and existence of a precedent agreement. (Doc. 29 at 16; AR 001876.) But the administrative record does discuss the substance of what the contract promised in that it analyzes the 122-mile natural gas pipeline that ETNG would build pursuant to the contract. (AR 001804.) The Plaintiffs argue that "by issuing a final decision based on the Final EIS, Mr. Lyash at a minimum indirectly considered the Precedent Agreement." (Doc. 26 at 17.) The Court agrees for the same reasons that the Court found the GE contract was indirectly considered.

Here, there was heavy reliance on what the contract promised in presenting Alternative A. This was a companion project to Alternative A, and the EIS "evaluate[d] related actions associated with gas supply, including construction and operation by ETNG of a 122-mile natural gas pipeline." (AR 001804.) The EIS references where it would be located and the environmental consequences of the pipeline. (AR 001830.) And finally, the EIS actually does reference the Precedent Agreement, if only to explain the source of the 122-mile pipeline. (AR 001876.) Again, it is hard to conceive how the decisionmaker could have relied on the contract's material benefit without considering the terms of the actual contract. The fact that a 122-mile pipeline would be built necessarily relies on the existence of amenable contract terms. Plaintiffs have presented clear evidence that the existence of the 122-mile pipeline was heavily relied upon by Mr. Lyash such

16

that the contract that produces that pipeline would have been indirectly considered by the decisionmaker. *See Ohio Coal Ass'n*, 2017 U.S. Dist. LEXIS 216950, at *6.

### 2. Records of Expenses

Plaintiffs also seek to add two categories of "records of expenses." They seek to add records related to the GE contract and records of expenses from ENTG to TVA about the ninety-four million dollars spent on the project by March 2024. (Doc. 29 at 6–7, 15–18)

The Court will first address the records related to the GE contract and Kingston Gas Plant's equipment. The Court is unclear what these "records of expenses" are or if they exist. Plaintiffs "must identify the materials allegedly omitted from the record with sufficient specificity." *City of Jewell*, 968 F. Supp. 2d at 288. Plaintiffs cite to a filing with the SEC that stated "TVA had spent $181 million on long lead time equipment in connection with this planned project." (Doc. 29 at 7.) Plaintiffs also cite to a declaration where TVA's Vice President of Major Projects, Roger Waldrop, states that "TVA issued a purchase order to GE for the $20,025,798.10 non-refundable down payment." (*Id.*) Plaintiffs assume that there are records of these expenses that were before the decisionmaker that are not in the administrative record. But assumptions about documents that may or may not exist are not enough. Plaintiffs cannot merely "proffer[] broad categories of documents and data that are likely to exist as a result of other documents that are included in the administrative record." *Jewell*, 968 F. Supp. 2d at 288. "[C]onclusory allegations that the administrative record lacked unspecified reports" are not enough to overcome the presumption that the agency correctly designated the record. *Id.* As such, the requests to complete the record with records of expenses will be denied. [4]

---

[4] It is unclear whether this expense is the same as related expenses under the GE Contract. (Doc. 29 at 13.) To the extent that Plaintiffs are referring to different records, Plaintiffs have not proven what those related records of expenses under the GE Contract are and

The ETNG records are a closer call because there is at least some evidence these may exist as discrete materials. That is because the Precedent Agreement required ETNG to submit "any notice, request, demand, statement, or bill provided for in this Precedent agreement." (Doc. 29 at 17–18, (*citing* AR 005192–93).) But evidence that TVA *had* the records of this expense does not constitute evidence that TVA considered them. Plaintiffs have not shown clear evidence that these records of expenses were considered by the decisionmaker, either directly or indirectly. Therefore, the request to complete the record with these records is denied.

### 3. Financial and Systems Analysis

Plaintiffs also seek to supplement the record with TVA's "financial and system analysis" which is the analysis that TVA used to evaluate alternatives in the EIS. (Doc. 29 at 18–21; AR 002800) Plaintiffs allege that "TVA analyzed the 'total system costs' of various alternatives" and based its finding that the Kingston Gas Plant would be the lowest cost alternative on that analysis. (Doc. 29 at 19.) TVA represents that the analysis is "not a discrete document or documents or even a compilation of discrete documents," but rather "a process which utilizes standard proprietary modeling tools and involves voluminous underlying source and/or raw data inputs and outputs." (Doc. 30 at 26 (citing Doc. 31 ¶¶ 11–20).) Clifton Lowry, TVA's Vice President for Planning and Investor Relations in TVA's finance organization, confirmed in a deposition that it "is not a single document or even a set of discernible documents." (Doc. 31 ¶ 6.)

The Court must first discern what constitutes the financial and systems analysis sought by Plaintiffs. After review of the record, the Court determines that the analysis refers to the raw data that went into the Planning and Investor Relations' determination of which alternative best met TVA's generation needs. (Doc. 31 at 7.) The Kingston EIS contains the results of the modeling

that they were considered in rendering a decision.

in Appendix B. (AR 002769–2803). This modeling started with the 2019 Integrated Resource Plan, which "establish[es] TVA's overall asset strategy and serves as a long-range, least cost planning tool." (Doc. 31 ¶ 9.) The modeling was used for subsequent site-specific projects like the Kingston EIS and was adjusted to "evaluate the change in costs for the site-specific asset decisions studied for Kingston." (*Id.* ¶ 19.) TVA understands Plaintiff's request to be "for the disaggregated raw data which constitutes the underlying source data used in proprietary software by TVA's Enterprise Planning department." (Doc. 29-2 at 6.) The data was inputted into "proprietary modeling software licensed to TVA and interpreted by TVA subject-matter experts with knowledge of TVA's power system." (*Id.* at 7.)

The analysis in Appendix B formed the basis for rejecting alternatives and played a role in the least-cost decision made by the agency, the arbitrariness of which is at issue in this case. (Doc. 1 ¶ 306.) There is no question that the modeling results were considered by the decisionmaker; they are included in Appendix B and were used to determine "which alternative best met TVA's generation needs at this site." (Doc. 30 at 26.) The question is whether the decisionmaker relied so heavily on the results that he indirectly considered the underlying source data. *See Partners in Forestry Co-Op., Northwood All., Inc.*, 638 F. App'x at 469.

Plaintiffs request access to the raw data underlying the conclusions in Appendix B. (Doc. 19 at 20–21.) "Where… raw data itself is at issue and was directly considered, analyzed, or manipulated by the agency in the course of reaching its decision, that raw or underlying data is properly considered part of the administrative record." (*Id.* at 19 (quoting *Univ. of Colo. Health*, 151 F. Supp. 3d at 23).) Courts have also ordered agencies to supplement administrative records with particular formulas, despite uncertainty about the form those formulas may take, if they were used to arrive at particular statistics. *See, e.g.*, *Univ. of Colo. Health*, 151 F. Supp. 3d at 20. But

19

the underlying source data does not need to be part of the administrative record if the data was not actually considered by the agency. *Univ. of Colo. Health*, 151 F. Supp. 3d at 23.

Because the modeling results are integral to the least-cost planning tool, the underlying source data is similarly integral to those conclusions and would aid judicial review. Plaintiffs here have made a reasonably specific showing that the agency relied heavily on the analysis in making its decision about which alternative was the least-costly alternative. *Cf. Burwell*, 109 F. Supp. 3d at 51 ("Plaintiffs have provided a reasonably specific showing that the Agency relied on such formulas in making decisions about the fixed loss thresholds and outlier payments which are directly challenged in this case."). The reliance on the analysis was heavy given that it served as the basis for the rejection of alternatives. Therefore, the underlying data was at least indirectly considered by the agency. The Court will order completion of the record with the underlying source data that TVA used to arrive at the results in Appendix B of the EIS.[5]

The Court recognizes that some of these documents may be subject to certain privilege limitations, including deliberative-process privilege. While Plaintiffs preemptively raised the issue and included in their motion a communication between TVA and Southern Environmental Law Center (Docs. 29-1, 29-2) debating the applicability of deliberative-process privilege, such an issue was not raised in briefing by TVA. *See Merit Med. Sys. v. Aspen Surgical Prods., Inc.*, No. 05-0040, 2007 U.S. Dist. LEXIS 17537, at *4 (W.D. Mich. Mar. 12, 2007) (declining to consider "preemptive counter-arguments" made by Plaintiff). The deliberative-process privilege inquiry is a separate inquiry from the completion inquiry and need not be decided at this moment. TVA may raise such an issue, or any other issue related to privilege, disclosure, or sealing, in a

---

[5] This does not include the proprietary modeling software licensed to TVA by third parties, which the Plaintiffs have not sought to include. (Doc. 31 at 5.)

20

future motion which the Court will consider at that time.

**B.** **Supplementation of the Record**

Plaintiffs argue that, in the alternative, there is a sufficient showing of bad faith on behalf of TVA to justify supplementing the record, or ordering extra-record discovery. APA review is limited to "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). There must be a showing of bad faith for a district court to consider documents that the agency did not consider. In supplementation cases, the plaintiff "must make a strong showing of bad faith." *Latin Ams. for Soc. & Econ. Dev.*, 756 F.3d at 465. This is consistent with the Supreme Court's mandate to avoid "inquiry into the mental processes of administrative decisionmakers." *Overton Park*, 401 U.S. at 420. Staying inside the limited record that existed at the time of the decision facilitates the Court's role in APA review as one where the Court "'sits as an appellate tribunal,' not a forum of first impression." *Chamber of Comm. of U.S. v. SEC*, 670 F.3d 537, 550 (M.D. Tenn. 2023) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)). Just as an appellate court would typically not go outside the record on appeal, so too here. "Fishing expeditions in aid of supplementing the administrative record are not permitted." *Beverly Hills Unified Sch. Dist. v. Fed. Transit. Admin.*, CV 12-9861, 2013 U.S. Dist. LEXIS 165806, at *17 (C.D. Cal. 2013)).

Plaintiffs argue that "TVA acted in bad faith by conducting a sham NEPA review… only *after* committing itself to the Kingston Gas Plant." (Doc. 29 at 23 (emphasis in original).) But mere existence of a contract does not establish the kind of predetermination and bad faith that would allow this court to re-open discovery. Evidence of predetermination must meet a high standard—it occurs "only when an agency irreversibly and irretrievably commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome

21

before the agency has completed that environmental analysis." *See Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 715 (10th Cir. 2010); *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000).

Here, Plaintiffs have not made that showing. While Plaintiffs have shown that there were two tentative contracts entered into to support Alternative A, this does not rise to the high level of bad faith required to inquire into the mindsets of the decisionmakers. *See Overton Park*, 401 U.S. at 420, and *Latin Ams. for Soc. & Econ. Dev.*, 756 F.3d at 465. Importantly, the decisionmakers explicitly stated that neither contract was an irreversible and irretrievable commitment, and that any such contracts were contingent on the necessary regulatory approvals. (AR 002857–58.) The agency did not hide the existence of the contracts, as evidenced by their references in Alternative A and in their response to Conservation Groups' comments. Such behavior indicates that the agency was not acting in bad faith in conducting its review or compilation of the record.

Furthermore, this is a merits inquiry, and the Court does not need additional information to determine whether the agency adequately considered the environmental impacts of the Kingston Gas Plant beyond the 64,000 page record already submitted. *See Ctr. for Bio. Diversity v. U.S. Forest Serv.*, No. 3:17-cv-372, 2018 WL 7200718, at *9 (S.D. Ohio 2018) ("Plaintiffs conflate the need for supplementation with the underlying merits of their claim.") The Court will consider the predetermination argument at the merits stage, but instantly, the high standard for bad faith has not been met to justify extra-record discovery.

Because Plaintiffs have not demonstrated the requisite bad faith, the Court will **DENY** Plaintiff's motion to supplement the administrative record with the records of expenses, the Lyash Email, TVA SEC Filing, and Enbridge SEC Filing.

22

## IV.    <u>CONCLUSION</u>

The Court **WILL GRANT IN PART** Plaintiff's motion to complete the administrative record (Doc. 28) with the unredacted GE contract, the unredacted ETNG contract, and the financial and systems analysis. The Court **WILL DENY IN PART** Plaintiff's motion to complete the administrative record (Doc. 28) with the records of expenses. The Court **WILL DENY** Plaintiff's motion to supplement the administrative record (Doc. 28).

**AN APPROPRIATE ORDER WILL ENTER.**

<u>**/s/**</u>
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**